# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
### BRUNSWICK DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　　　　　Plaintiff, | )<br>)<br>) | |
| 　　　　v. | )<br>) | Civil Action No. 2:16-cv-00112 |
| HONEYWELL INTERNATIONAL INC.<br>and GEORGIA POWER COMPANY,<br>　　　　　　　　　　Defendants. | )<br>)<br>) | |

## CONSENT DECREE FOR REMEDIAL DESIGN AND REMEDIAL ACTION AT OPERABLE UNIT ONE OF THE LCP CHEMICALS SUPERFUND SITE



# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | BACKGROUND | 1 |
| II. | JURISDICTION | 2 |
| III. | PARTIES BOUND | 2 |
| IV. | DEFINITIONS | 3 |
| V. | GENERAL PROVISIONS | 6 |
| VI. | PERFORMANCE OF THE WORK | 7 |
| VII. | REMEDY REVIEW | 9 |
| VIII. | PROPERTY REQUIREMENTS | 9 |
| IX. | FINANCIAL ASSURANCE | 14 |
| X. | PAYMENTS FOR RESPONSE COSTS | 17 |
| XI. | INDEMNIFICATION AND INSURANCE | 19 |
| XII. | FORCE MAJEURE | 20 |
| XIII. | DISPUTE RESOLUTION | 21 |
| XIV. | STIPULATED PENALTIES | 23 |
| XV. | COVENANTS BY PLAINTIFF | 26 |
| XVI. | COVENANTS BY SDs | 28 |
| XVII. | EFFECT OF SETTLEMENT; CONTRIBUTION | 29 |
| XVIII. | ACCESS TO INFORMATION | 30 |
| XIX. | RETENTION OF RECORDS | 31 |
| XX. | NOTICES AND SUBMISSIONS | 32 |
| XXI. | RETENTION OF JURISDICTION | 33 |
| XXII. | APPENDICES | 34 |
| XXIII. | MODIFICATION | 34 |
| XXIV. | LODGING AND OPPORTUNITY FOR PUBLIC COMMENT | 34 |
| XXV. | SIGNATORIES/SERVICE | 34 |
| XXVI. | FINAL JUDGMENT | 35 |

# I.   BACKGROUND

A.     The United States of America (United States), on behalf of the Administrator of the United States Environmental Protection Agency (EPA), filed a complaint in this matter pursuant to Sections 106 and 107 of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9606 and 9607.

B.     The United States in its complaint seeks, *inter alia*: (1) reimbursement of costs incurred by EPA and the Department of Justice (DOJ) for response actions at Operable Unit One of the LCP Chemicals Superfund Site in Brunswick, Glynn County, Georgia, together with accrued interest; and (2) performance of response actions by the defendants at Operable Unit One of the Site consistent with the National Contingency Plan, 40 C.F.R. Part 300 (NCP).

C.     In accordance with the NCP and Section 121(f)(1)(F) of CERCLA, 42 U.S.C. § 9621(f)(1)(F), EPA notified the State of Georgia (State) on September 28, 2015, of negotiations with Atlantic Richfield Company, Inc., Georgia Power Company, and Honeywell International Inc.—the potentially responsible parties (PRPs)—regarding the implementation of the remedial design and remedial action (RD/RA) for Operable Unit One of the Site, and EPA has provided the State with an opportunity to participate in such negotiations and be a party to this Consent Decree (CD).

D.     In accordance with Section 122(j)(1) of CERCLA, 42 U.S.C. § 9622(j)(1), EPA notified the U.S. Department of the Interior and the National Oceanic and Atmospheric Administration on September 28, 2015, of negotiations with PRPs regarding the release of hazardous substances that may have resulted in injury to the natural resources under federal trusteeship and encouraged the trustees to participate in the negotiation of this CD.

E.     The Settling Defendants (SDs) do not admit any liability to Plaintiff arising out of the transactions or occurrences alleged in the complaint, nor do they acknowledge that the release or threatened release of hazardous substance(s) at or from the Site constitutes an imminent and substantial endangerment to the public health or welfare or the environment.

F.     Pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, EPA placed the Site on the National Priorities List (NPL), set forth at 40 C.F.R. Part 300, Appendix B, by publication in the *Federal Register* on June 17, 1996, 61 Fed. Reg. 30,510.

G.     In response to a release or a substantial threat of a release of a hazardous substance(s) at or from the Site, SDs commenced on July 6, 1995, a Remedial Investigation and Feasibility Study (RI/FS) for the Site pursuant to 40 C.F.R. § 300.430.

H.     SDs completed a Remedial Investigation (RI) Report in November of 2012, and SDs completed a Feasibility Study (FS) Report on August 25, 2015.

I.     Pursuant to Section 117 of CERCLA, 42 U.S.C. § 9617, EPA published notice of the completion of the FS and of the proposed plan for remedial action on December 1, 2014, in the *Brunswick News*, a major local newspaper of general circulation. EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the

1

administrative record upon which the Director of the Superfund Division, EPA Region 4, based the selection of the response action.

J.      The decision by EPA on the remedial action to be implemented at Operable Unit One of the Site is embodied in a final Record of Decision (ROD), executed on September 22, 2015, on which the State had a reasonable opportunity to review and comment/on which the State has given its concurrence. The ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

K.      Based on the information presently available to EPA, EPA believes that the Work will be properly and promptly conducted by SDs if conducted in accordance with this CD and its appendices.

L.      Solely for the purposes of Section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and the Work to be performed by SDs shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

M.      The Parties recognize, and the Court by entering this CD finds, that this CD has been negotiated by the Parties in good faith and implementation of this CD will expedite the cleanup of the Site and will avoid prolonged and complicated litigation between the Parties, and that this CD is fair, reasonable, and in the public interest.

NOW, THEREFORE, it is hereby Ordered, Adjudged, and Decreed:

## II.      JURISDICTION

1.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345, and 42 U.S.C. §§ 9606, 9607, and 9613(b). This Court also has personal jurisdiction over SDs. Solely for the purposes of this CD and the underlying complaint, SDs waive all objections and defenses that they may have to jurisdiction of the Court or to venue in this District. SDs shall not challenge the terms of this CD or this Court's jurisdiction to enter and enforce this CD.

## III.      PARTIES BOUND

2.      This CD is binding upon the United States and upon SDs and their successors and assigns. Any change in ownership or corporate or other legal status of a SD including, but not limited to, any transfer of assets or real or personal property, shall in no way alter such SD's responsibilities under this CD.

3.      SDs shall provide a copy of this CD to each contractor hired to perform the Work and to each person representing any SD with respect to the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this CD. SDs or their contractors shall provide written notice of the CD to all subcontractors hired to perform any portion of the Work. SDs shall nonetheless be responsible for ensuring that their contractors and subcontractors perform the Work in accordance with the terms of this CD. With regard to the activities undertaken pursuant to this CD, each contractor and subcontractor

2

shall be deemed to be in a contractual relationship with SDs within the meaning of Section 107(b)(3) of CERCLA, 42 U.S.C. § 9607(b)(3).

## IV.   DEFINITIONS

4.      Unless otherwise expressly provided in this CD, terms used in this CD that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this CD or its appendices, the following definitions shall apply solely for purposes of this CD:

"Affected Property" shall mean all real property at Operable Unit One of the Site and any other real property where EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or ICs are needed to implement the Remedial Action for Operable Unit One, including, but not limited to, the area known as the LCP Chemicals marsh, which occupies approximately 760 acres and is bordered by a former Glynn County land disposal facility and a pistol firing range to the north, Ross Road to the east, the Turtle River and associated marshes to the west, and the Brunswick Cellulose plant to the south. The Affected Property is in the immediate vicinity of the facility at 4125 Ross Road, Brunswick, Georgia, and is depicted generally on the map attached as *Appendix C*.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601-9675.

"Consent Decree" or "CD" shall mean this consent decree and all appendices attached hereto (listed in Section XXII). In the event of conflict between this CD and any appendix, this CD shall control.

"Day" or "day" shall mean a calendar day. In computing any period of time under this CD, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"DOJ" shall mean the United States Department of Justice and its successor departments, agencies, or instrumentalities.

"Effective Date" shall mean the date upon which the approval of this CD is recorded on the Court's docket.

"EPA" shall mean the United States Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Future Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, that the United States incurs in reviewing or developing deliverables submitted pursuant to this CD, in overseeing implementation of the Work, or otherwise implementing, overseeing, or enforcing this CD, including, but not limited to, payroll costs, contractor costs, travel costs, laboratory costs, the costs incurred pursuant to ¶ 11 (Emergencies and Releases), ¶ 12 (Community Involvement) (including the costs of any technical assistance grant under Section 117(e) of CERCLA, 42 U.S.C. § 9617(e)), ¶ 27 (Access to Financial Assurance),

3

Section VII (Remedy Review), Section VIII (Property Requirements) (including the cost of attorney time and any monies paid to secure access and/or to secure, implement, monitor, maintain, or enforce Institutional Controls including the amount of just compensation), and Section XIII (Dispute Resolution), and all litigation costs. Future Response Costs shall also include: all Interim Response Costs; and all Agency for Toxic Substances and Disease Registry (ATSDR) costs paid at or in connection with the Site since August 25, 2015.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www.epa.gov/ocfopage/finstatement/superfund/int_rate.htm.

"Interim Response Costs" shall mean all costs, including, but not limited to, direct and indirect costs, (a) paid by the United States in connection with the Site between August 25, 2015 and the Effective Date, or (b) incurred prior to the Effective Date but paid by the United States after that date.

"LCP Chemicals Superfund Site Special Account" shall mean the special account, within the EPA Hazardous Substance Superfund, established for the Site by EPA pursuant to Section 122(b)(3) of CERCLA, 42 U.S.C. § 9622(b)(3), in the Administrative Settlement Agreement and Order on Consent for Removal Action, U.S. EPA Region 4 Docket No. CERCLA-04-2007-3760, which took effect on April 18, 2007.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Settling Owner" shall mean any person, other than a SD, that owns or controls any Affected Property, including the State of Georgia. The clause "Non-Settling Owner's Affected Property" means Affected Property owned or controlled by Non-Settling Owner.

"Operable Unit One" or "OU1" shall mean the LCP Chemicals marsh, which occupies approximately 760 acres immediately northwest of Brunswick, Glynn County, Georgia. Operable Unit One is bordered by a former Glynn County land disposal facility and a pistol firing range on the north, Ross Road on the east, the Turtle River and associated marshes to the west, and the Brunswick Cellulose plant to the south. The LCP Chemicals marsh consists of approximately 662 acres of flat, vegetated tidal marsh and 98 acres of tidal creeks. Operable Unit One is depicted generally on the map attached as *Appendix C*.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the SOW or any EPA-approved O&M Plan.

"Owner SD" shall mean any SD that owns or controls any Affected Property, including Honeywell International Inc. The clause "Owner SD's Affected Property" means Affected Property owned or controlled by Owner SD.

"Paragraph" or "¶" shall mean a portion of this CD identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the United States and SDs.

"Performance Standards" shall mean the cleanup levels and other measures of achievement of the remedial action objectives, as set forth in the ROD.

"Plaintiff" shall mean the United States.

"Proprietary Controls" shall mean easements or covenants running with the land that (a) limit land, water, or other resource use and/or provide access rights and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992 (also known as the Resource Conservation and Recovery Act).

"Record of Decision" or "ROD" shall mean the EPA Record of Decision relating to Operable Unit One of the Site signed on September 22, 2015, by the Regional Administrator, EPA Region 4, or his/her delegate, and all attachments thereto. The ROD is attached as *Appendix A*.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD.

"Remedial Design" or "RD" shall mean those activities to be undertaken by SDs to develop final plans and specifications for the RA as stated in the SOW.

"Section" shall mean a portion of this CD identified by a Roman numeral.

"Settling Defendants" or "SDs" shall mean Georgia Power Company and Honeywell International Inc.

"Site" shall mean the LCP Chemicals Superfund Site, located at 4125 Ross Road in Brunswick, Glynn County, Georgia, and depicted generally on the map attached as *Appendix C*. The Site has been organized into three operable units (OUs): OU1, the LCP Chemicals marsh; OU2, the Site's groundwater, including the surface and subsurface soil of a former mercury cell building area; and OU3, the remaining uplands, excluding the mercury cell building area.

"State" shall mean the State of Georgia.

"Statement of Work" or "SOW" shall mean the document describing the activities SDs must perform to implement the RD, the RA, and O&M regarding Operable Unit One of the Site, which is attached as *Appendix B*.

"Supervising Contractor" shall mean the principal contractor retained by SDs to supervise and direct the implementation of the Work under this CD.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including EPA.

"Waste Material" shall mean (1) any "hazardous substance" under Section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (2) any pollutant or contaminant under Section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (3) any "solid waste" under Section 1004(27) of RCRA, 42 U.S.C.§ 6903(27); and (4) any "hazardous substance" under Section 12-14-1(4) of the Georgia Code, O.C.G.A. § 12-14-1(4).

"Work" shall mean all activities and obligations SDs are required to perform under this CD, except the activities required under Section XIX (Retention of Records).

## V.     GENERAL PROVISIONS

5.     **Objectives of the Parties**. The objectives of the Parties in entering into this CD are to protect public health or welfare or the environment by the design and implementation of response actions at Operable Unit One of the Site by SDs, to pay response costs of Plaintiff, and to resolve the claims of Plaintiff against SDs as provided in this CD.

6.     **Commitments by SDs**.

a.     SDs shall finance and perform the Work in accordance with this CD and all deliverables developed by SDs and approved or modified by EPA pursuant to this CD. SDs shall pay the United States for its response costs as provided in this CD.

b.     SDs' obligations to finance and perform the Work, including obligations to pay amounts due under this CD, are joint and several. In the event of the insolvency of any SD or the failure by any SD to implement any requirement of this CD, the remaining SDs shall complete all such requirements.

7.     **Compliance with Applicable Law**. Nothing in this CD limits SDs' obligations to comply with the requirements of all applicable federal and state laws and regulations. SDs must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD and the SOW. The activities conducted pursuant to this CD, if approved by EPA, shall be deemed to be consistent with the NCP as provided in Section 300.700(c)(3)(ii) of the NCP.

6

8. **Permits**.

a. As provided in Section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and Section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, SDs shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

b. SDs may seek relief under the provisions of Section XII (Force Majeure) for any delay in the performance of the Work resulting from a failure to obtain, or a delay in obtaining, any permit or approval referenced in ¶ 8.a and required for the Work, provided that they have submitted timely and complete applications and taken all other actions necessary to obtain all such permits or approvals.

c. This CD is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

## VI.   PERFORMANCE OF THE WORK

9. **Coordination and Supervision**.

a. **Project Coordinators**.

(1) SDs' Project Coordinator must have sufficient technical expertise to coordinate the Work. SDs' Project Coordinator may not be an attorney representing any SD in this matter and may not act as the Supervising Contractor. SDs' Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

(2) EPA shall designate and notify the SDs of its Project Coordinator and Alternate Project Coordinator, if any. EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

(3) SDs shall meet regularly with EPA as directed or determined by EPA.

b. **Supervising Contractor**. SDs' proposed Supervising Contractor must have a quality assurance system that complies with ANSI/ASQC E4-2004, Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use (American National Standard).

7

c.    **Procedures for Disapproval/Notice to Proceed.**

(1)    SDs shall designate, and notify EPA, within 30 days after the Effective Date, of the name, contact information, and qualifications of the SDs' proposed Project Coordinator and Supervising Contractor.

(2)    EPA, after a reasonable opportunity for review and comment by the State, shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If EPA issues a notice of disapproval, SDs shall, within 30 days, submit to EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. SDs may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify EPA of SDs' selection.

(3)    SDs may change their Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 9.c(1) and 9.c(2).

10.    **Performance of Work in Accordance with SOW.** SDs shall: (a) develop the RD; (b) perform the RA; and (c) operate, maintain, and monitor the effectiveness of the RA; all in accordance with the SOW and all EPA-approved, conditionally-approved, or modified deliverables as required by the SOW. All deliverables required to be submitted for approval under the CD or SOW shall be subject to approval by EPA in accordance with ¶ 6.6 (Approval of Deliverables) of the SOW.

11.    **Emergencies and Releases.** SDs shall comply with the emergency and release response and reporting requirements under ¶ 4.3 (Emergency Response and Reporting) of the SOW. Subject to Section XV (Covenants by Plaintiff), nothing in this CD, including ¶ 4.3 of the SOW, limits any authority of Plaintiff: (a) to take all appropriate action to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site, or (b) to direct or order such action, or seek an order from the Court, to protect human health and the environment or to prevent, abate, respond to, or minimize an actual or threatened release of Waste Material on, at, or from the Site. If, due to SDs' failure to take appropriate response action under ¶ 4.3 of the SOW, EPA takes such action instead, SDs shall reimburse EPA under Section X (Payments for Response Costs) for all costs of the response action.

12.    **Community Involvement.** If requested by EPA, SDs shall conduct community involvement activities under EPA's oversight as provided for in, and in accordance with, the SOW. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator and implementation of a technical assistance plan. Costs incurred by the United States under this Section constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

13.    **Modification of SOW or Related Deliverables.**

a.    If EPA determines that it is necessary to modify the work specified in the SOW and/or in deliverables developed under the SOW in order to achieve and/or maintain the

8

Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in ¶ 1.3 of the SOW, then EPA may notify SDs of such modification. If SDs object to the modification they may, within 30 days after EPA's notification, seek dispute resolution under Section XIII.

        b.     The SOW and/or related work plans shall be modified: (1) in accordance with the modification issued by EPA; or (2) if SDs invoke dispute resolution, in accordance with the final resolution of the dispute. The modification shall be incorporated into and enforceable under this CD, and SDs shall implement all work required by such modification. SDs shall incorporate the modification into the deliverable required under the SOW, as appropriate.

        c.     Nothing in this Paragraph shall be construed to limit EPA's authority to require performance of further response actions as otherwise provided in this CD.

14.    Nothing in this CD, the SOW, or any deliverable required under the SOW constitutes a warranty or representation of any kind by Plaintiff that compliance with the work requirements set forth in the SOW or related deliverable will achieve the Performance Standards.

## VII.   REMEDY REVIEW

15.    **Periodic Review**. SDs shall conduct, in accordance with ¶ 6.7(k) (Periodic Review Support Plan) of the SOW, studies and investigations to support EPA's reviews under Section 121(c) of CERCLA, 42 U.S.C. § 9621(c), and applicable regulations, of whether the RA is protective of human health and the environment.

## VIII.   PROPERTY REQUIREMENTS

16.    **Notice Requirement**. The SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure Non-Settling Owner's cooperation in placing signs around the Affected Property that designate the area as being subject to a commercial fishing ban and fish consumption advisory as determined by the Georgia Department of Natural Resources; and Owner SD shall, with respect to Owner SD's Affected Property, place signs around the Affected Property that designate the area as being subject to a commercial fishing ban and fish consumption advisory as determined by the Georgia Department of Natural Resources. This requirement shall continue until EPA certifies that the RA is complete according to ¶ 4.6 (Certification of RA Completion) of the SOW, or until such time that there are no longer any applicable fishing restrictions or fish consumption advisories, whichever is sooner.

17.    **Proprietary Controls**. SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure Non-Settling Owner's cooperation in executing and recording; and Owner SD shall, with respect to Owner SD's Affected Property, execute and record, in accordance with the procedures of this ¶ 17, Proprietary Controls that: (i) grant a right of access to conduct any activity regarding the CD, including those activities listed in ¶ 17.a; and (ii) grant the right to enforce the land, water, or other resource use restrictions set forth in ¶ 17.b.

        a.     **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

        (1)     Monitoring the Work;

9

(2)    Verifying any data or information submitted to the United States;

(3)    Conducting investigations regarding contamination at or near the Site;

(4)    Obtaining samples;

(5)    Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)    Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the SOW;

(7)    Implementing the Work pursuant to the conditions set forth in ¶ 62 (Work Takeover);

(8)    Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by SDs or their agents, consistent with Section XVIII (Access to Information);

(9)    Assessing SDs' compliance with the CD;

(10)    Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the CD; and

(11)    Implementing, monitoring, maintaining, reporting on, and enforcing any Institutional Controls.

b.    **Land, Water, or Other Resource Use Restrictions**. Any activity that will disturb the caps to be built on segments of the Affected Property as part of the Remedial Action is prohibited because such activities could result in direct or indirect exposure to contaminants in sediments and surface water.

c.    **Grantees**. The Proprietary Controls must be granted to one or more of the following persons and their representatives, as determined by EPA: the United States, the State, SDs, Owner SDs, if any, and other appropriate grantees. Any Proprietary Controls in the nature of a restrictive covenant consistent with the requirements of the Uniform Environmental Covenants Act (UECA) granted to persons other than the United States must include: (1) a designation that EPA (and/or the State as appropriate) is an "agency" or a party expressly granted the right of access; and (2) the right to enforce the covenants allowing EPA and/or the State to maintain the right to enforce the Proprietary Controls without acquiring an interest in real property.

d.    **Initial Title Evidence**. SDs and Owner SD shall, within 180 days after the Effective Date:

(1)    **Record Title Evidence**. Submit to EPA a title insurance commitment or other title evidence acceptable to EPA that: (i) names the proposed insured or the party in whose favor the title evidence runs, or the party who will hold the

real estate interest, or if that party is uncertain, names the United States, the State, the SD, or "To Be Determined;" (ii) covers the Affected Property that is to be encumbered; (iii) demonstrates that the person or entity that will execute and record the Proprietary Controls is the owner of such Affected Property; (iv) identifies all record matters that affect title to the Affected Property, including all prior liens, claims, rights (such as easements), mortgages, and other encumbrances (collectively, "Prior Encumbrances"); and (v) includes complete, legible copies of such Prior Encumbrances; and

(2)     **Non-Record Title Evidence**. Submit to EPA a report of the results of an investigation, including a physical inspection of the Affected Property, which identifies non-record matters that could affect the title, such as unrecorded leases or encroachments.

e.     **Release or Subordination of Prior Liens, Claims, and Encumbrances**.

(1)     SDs and Owner SD shall secure the release, subordination, modification, or relocation of all Prior Encumbrances on the title to the Affected Property revealed by the title evidence or otherwise known to the SDs or Owner SD unless EPA waives this requirement as provided under ¶¶ 17.e(2)-(4).

(2)     SDs and Owner SD may, by the deadline under ¶ 17.d, submit an initial request for waiver of the requirements of ¶ 17.e(1) regarding one or more Prior Encumbrances, on the grounds that such Prior Encumbrances cannot defeat or adversely affect the rights to be granted by the Proprietary Controls and cannot interfere with the remedy or result in unacceptable exposure to Waste Material.

(3)     SDs and Owner SD may, within 180 days after the Effective Date, or if an initial waiver request has been filed, within 45 days after EPA's determination on the initial waiver request, submit a final request for a waiver of the requirements of ¶ 17.e(1) regarding any particular Prior Encumbrance on the grounds that SDs or Owner SD could not obtain the release, subordination, modification, or relocation of such Prior Encumbrance despite best efforts.

(4)     The initial and final waiver requests must include supporting evidence including descriptions of and copies of the Prior Encumbrances and maps showing areas affected by the Prior Encumbrances. The final waiver request also must include evidence of efforts made to secure release, subordination, modification, or relocation of the Prior Encumbrances.

(5)     SDs and Owner SD shall complete their obligations under ¶ 17.e(1) regarding all Prior Encumbrances: within 270 days after the Effective Date; or if an initial waiver request has been filed, within 135 days after EPA's determination on the initial waiver request; or if a final waiver request has been filed, within 90 days after EPA's determination on the final waiver request.

11

f.     **Update to Title Evidence and Recording of Proprietary Controls.**

(1)     SDs and Owner SD shall submit to EPA for review and approval, by the deadline specified in ¶ 17.e(5), all draft Proprietary Controls and draft instruments addressing Prior Encumbrances.

(2)     Upon EPA's approval of the proposed Proprietary Controls and instruments addressing Prior Encumbrances, SDs and Owner SD shall, within 30 days, update the original title insurance commitment (or other evidence of title acceptable to EPA) under ¶ 17.d. If the updated title examination indicates that no liens, claims, rights, or encumbrances have been recorded since the effective date of the original commitment (or other title evidence), SDs and Owner SD shall secure the immediate recordation of the Proprietary Controls and instruments addressing Prior Encumbrances in the appropriate land records. Otherwise, SDs and Owner SD shall secure the release, subordination, modification, or relocation under ¶ 17.e(1), or the waiver under ¶¶ 17.e(2)-(4), regarding any newly-discovered liens, claims, rights, and encumbrances, prior to recording the Proprietary Controls and instruments addressing Prior Encumbrances.

(3)     If SDs submitted a title insurance commitment under ¶ 17.d(1), then upon the recording of the Proprietary Controls and instruments addressing Prior Encumbrances, SDs and Owner SD shall obtain a title insurance policy that: (i) is consistent with the original title insurance commitment; (ii) is for $100,000 or other amount approved by EPA; (iii) is issued to the United States, SDs, or other person approved by EPA; and (iv) is issued on a current American Land Title Association (ALTA) form or other form approved by EPA.

(4)     SDs and Owner SD shall, within 30 days after recording the Proprietary Controls and instruments addressing Prior Encumbrances, or such other deadline approved by EPA, provide to the United States and to all grantees of the Proprietary Controls: (i) certified copies of the recorded Proprietary Controls and instruments addressing Prior Encumbrances showing the clerk's recording stamps; and (ii) the title insurance policy(ies) or other approved form of updated title evidence dated as of the date of recording of the Proprietary Controls and instruments.

g.     SDs shall monitor, maintain, enforce, and annually report on all Proprietary Controls required under this CD.

h.     Owner SD shall not Transfer its Affected Property until it has executed and recorded all Proprietary Controls and instruments addressing Prior Encumbrances regarding such Affected Property in accordance with this ¶ 17.

18.     **Agreements Regarding Access and Non-Interference.**

a.     SDs shall, with respect to any Non-Settling Owner's Affected Property, use best efforts to secure from such Non-Settling Owner an agreement, enforceable by SDs and by Plaintiff, providing that such Non-Settling Owner, and Owner SD shall, with respect to Owner SD's Affected Property:

(1)     Provide Plaintiff and the other SDs, and their representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the CD, including those listed in ¶ 17.a (Access Requirements); and

(2)     Refrain from using such Affected Property in any manner that EPA determines will: (i) pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or (ii) interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action. The restrictions include those listed in ¶ 17.b (Land, Water, or Other Resource Use Restrictions).

b.     Owner SD shall not Transfer its Affected Property without first securing EPA's approval of, and transferee's consent to, an agreement that: (i) is enforceable by SDs and Plaintiff; and (ii) requires the transferee to provide access to and to refrain from using the Affected Property to the same extent as is provided under ¶ 18.a.

19.     **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of SDs and Owner SD would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure Proprietary Controls, agreements, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. If SDs and Owner SD are unable to accomplish what is required through "best efforts" in a timely manner, they shall notify the EPA and include a description of the steps taken to comply with the requirements. If the United States deems it appropriate, it may assist SDs or Owner SD or take independent action in obtaining such Proprietary Controls, agreements, releases, subordinations, modifications, or relocations of Prior Encumbrances that affect the title to the Affected Property, as applicable. All costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid, constitute Future Response Costs to be reimbursed under Section X (Payments for Response Costs).

20.     If EPA determines in a decision document prepared in accordance with the NCP that Institutional Controls in the form of state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls or notices are needed, SDs shall cooperate with EPA's efforts to secure and ensure compliance with such Institutional Controls.

21.     In the event of any Transfer of the Affected Property, unless the United States otherwise consents in writing, SDs shall continue to comply with their obligations under the CD, including their obligation to provide and/or secure access, to implement, maintain, monitor, and report on Institutional Controls, and to abide by such Institutional Controls.

22.     Notwithstanding any provision of the CD, Plaintiff retains all of its access authorities and rights, as well as all of its rights to require Institutional Controls, including enforcement authorities related thereto, under CERCLA, RCRA, and any other applicable statute or regulations.

13

## IX.   FINANCIAL ASSURANCE

23.   In order to ensure completion of the Work, SDs shall secure financial assurance, initially in the amount of $28,600,000.00 ("Estimated Cost of the Work"), for the benefit of EPA. The financial assurance must be one or more of the mechanisms listed in ¶ 23.a-g below, in a form substantially identical to the relevant sample documents available from the "Financial Assurance" category on the Cleanup Enforcement Model Language and Sample Documents Database at http://cfpub.epa.gov/compliance/models/, and satisfactory to EPA. SDs may use multiple mechanisms if they are limited to surety bonds guaranteeing payment, letters of credit, trust funds, escrow accounts, and/or insurance policies.

a.   A surety bond guaranteeing payment and/or performance of the Work that is issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury;

b.   One or more irrevocable letters of credit, payable to or at the direction of EPA, that is issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency;

c.   A trust fund established for the benefit of EPA that is administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency;

d.   A policy of insurance that provides EPA with acceptable rights as a beneficiary thereof and that is issued by an insurance carrier that has the authority to issue insurance policies in the applicable jurisdiction(s) and whose insurance operations are regulated and examined by a federal or state agency;

e.   A demonstration by one or more SDs that each such SD meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee, accompanied by a standby funding commitment, which obligates SDs to pay funds to or at the direction of EPA, up to the amount financially assured through the use of this demonstration in the event of a Work Takeover; or

f.   A guarantee to fund or perform the Work executed in favor of EPA by one of the following: (1) a direct or indirect parent company of a SD; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with a SD; provided, however, that any company providing such a guarantee must demonstrate to EPA's satisfaction that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

g.   An escrow account that provides EPA security and rights equivalent to those provided by a trust fund that meets the requirements of 40 C.F.R. § 264.151(a)(1) to finance the Work in accordance with this CD.  The escrow account shall provide that the funds placed therein are specifically and irrevocably reserved for the Work.  At EPA's request, SDs

14

shall make available to EPA any financial reports or other similar documents prepared by the escrow agent or other person responsible for approving payments out of the escrow account. Upon the issuance of the Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW, any funds remaining in the escrow account may be disbursed to SDs.

24.     SDs have selected, and EPA has found satisfactory, as an initial financial assurance, a letter of credit pursuant to Paragraph 23.b. The letter of credit may be reduced in accordance with ¶ 28 (Modification of Financial Assurance) as the Work is performed. Within 30 days after the Effective Date, or 30 days after EPA's approval of the form and substance of SDs' financial assurance, whichever is later, SDs shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance. Within 60 days after the Effective Date, or 30 days after EPA's approval of the form and substance of SDs' financial assurance, whichever is later, SDs shall submit such mechanisms and documents to Paula V. Painter, Program Analyst, Superfund Enforcement & Community Engagement Branch, 61 Forsyth Street SW, Atlanta, Georgia, 30303, and to the United States and EPA as specified in Section XX (Notices and Submissions).

25.     If SDs provide financial assurance by means of a demonstration or guarantee under ¶ 23.e or 23.f, the affected SDs shall also comply and shall ensure that their guarantors comply with the other relevant criteria and requirements of 40 C.F.R. § 264.143(f) and this Section, including, but not limited to: (a) the initial submission to EPA of required documents from the affected entity's chief financial officer and independent certified public accountant no later than 30 days after the Effective Date; (b) the annual resubmission of such documents within 90 days after the close of each such entity's fiscal year; and (c) the notification of EPA no later than 30 days, in accordance with ¶ 26, after any such entity determines that it no longer satisfies the relevant financial test criteria and requirements set forth at 40 C.F.R. § 264.143(f)(1). SDs agree that EPA may also, based on a belief that an affected entity may no longer meet the financial test requirements of ¶ 23.e or 23.f, require reports of financial condition at any time from such entity in addition to those specified in this Paragraph. For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Estimated Cost of the Work; (2) the phrase "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" includes the sum of all environmental obligations (including obligations under CERCLA, RCRA, and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially obligated in addition to the Estimated Cost of the Work under this CD; (3) the terms "owner" and "operator" include each SD making a demonstration or obtaining a guarantee under ¶ 23.e or 23.f; and (4) the terms "facility" and "hazardous waste management facility" include the Site.

26.     SDs shall diligently monitor the adequacy of the financial assurance. If any SD becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, such SD shall notify EPA of such information within 10 days. If EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, EPA will notify the affected SD of such determination. SDs shall, within 30 days after notifying EPA or receiving notice from EPA under this Paragraph, secure

and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. EPA may extend this deadline for such time as is reasonably necessary for the affected SD, in the exercise of due diligence, to secure and submit to EPA a proposal for a revised or alternative financial assurance mechanism, not to exceed 120 days. SDs shall follow the procedures of ¶ 28 (Modification of Financial Assurance) in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. SDs' inability to secure and submit to EPA financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this CD, including, without limitation, the obligation of SDs to complete the Work in accordance with the terms of this CD.

     27.   **Access to Financial Assurance.**

        a.    If EPA issues a notice of implementation of a Work Takeover under ¶ 62.b, then, in accordance with any applicable financial assurance mechanism and/or related standby funding commitment, EPA is entitled to: (1) the performance of the Work; and/or (2) require that any funds guaranteed be paid in accordance with ¶ 27.c.

        b.    If EPA is notified by the issuer of a financial assurance mechanism that it intends to cancel such mechanism, and the affected SD fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the funds guaranteed under such mechanism must be paid prior to cancellation in accordance with ¶ 27.c.

        c.    If, upon issuance of a notice of implementation of a Work Takeover under ¶ 62.b, either: (1) EPA is unable for any reason to promptly secure the resources guaranteed under any applicable financial assurance mechanism and/or related standby funding commitment, whether in cash or in kind, to continue and complete the Work; or (2) the financial assurance is provided under ¶ 23.e or 23.f, then EPA may demand an amount, as determined by EPA, sufficient to cover the cost of the remaining Work to be performed. SDs shall, within 30 days of such demand, pay the amount demanded as directed by EPA.

        d.    Any amounts required to be paid under this ¶ 27 shall be, as directed by EPA: (i) paid to EPA in order to facilitate the completion of the Work by EPA or by another person; or (ii) deposited into an interest-bearing account, established at a duly chartered bank or trust company that is insured by the FDIC, in order to facilitate the completion of the Work by another person. If payment is made to EPA, EPA may deposit the payment into the EPA Hazardous Substance Superfund or into the LCP Chemicals Superfund Site Special Account within the EPA Hazardous Substance Superfund to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund.

        e.    All EPA Work Takeover costs not paid under this ¶ 27 must be reimbursed as Future Response Costs under Section X (Payments for Response Costs).

     28.   **Modification of Amount, Form, or Terms of Financial Assurance.** SDs may submit, on any anniversary of the Effective Date or at any other time agreed to by the Parties, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to EPA in accordance with ¶ 24, and must include an

estimate of the cost of the remaining Work, an explanation of the basis for the cost calculation, and a description of the proposed changes, if any, to the form or terms of the financial assurance. EPA will notify SDs of its decision to accept or reject a requested reduction or change pursuant to this Paragraph. SDs may reduce the amount of the financial assurance mechanism only in accordance with: (a) EPA's approval; or (b) if there is a dispute, the agreement, final administrative decision, or final judicial decision resolving such dispute under Section XIII (Dispute Resolution). Any decision made by EPA on a request submitted under this Paragraph to change the form or terms of a financial assurance mechanism shall be made in EPA's sole and unreviewable discretion, and such decision shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum. Within 30 days after receipt of EPA's approval of, or the agreement or decision resolving a dispute relating to, the requested modifications pursuant to this Paragraph, SDs shall submit to EPA documentation of the reduced, revised, or alternative financial assurance mechanism in accordance with ¶ 24.

29. **Release, Cancellation, or Discontinuation of Financial Assurance**. SDs may release, cancel, or discontinue any financial assurance provided under this Section only: (a) if EPA issues a Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW; (b) in accordance with EPA's approval of such release, cancellation, or discontinuation; or (c) if there is a dispute regarding the release, cancellation or discontinuance of any financial assurance, in accordance with the agreement, final administrative decision, or final judicial decision resolving such dispute under to Section XIII (Dispute Resolution).

## X.      PAYMENTS FOR RESPONSE COSTS

30. **Payments by SDs for Future Response Costs**. SDs shall pay to EPA all Future Response Costs not inconsistent with the NCP.

a.      On a periodic basis, EPA will send SDs a bill requiring payment that includes a SCORPIOS Report, which includes direct and indirect costs incurred by EPA, its contractors, subcontractors, and DOJ. EPA will endeavor to send such bills on an annual basis, but failure to send a bill annually shall not affect EPA's right to collect under this Section. SDs shall make all payments within 30 days after SDs' receipt of each bill requiring payment, except as otherwise provided in ¶ 32, in accordance with ¶ 31.a (instructions for future response cost payments).

b.      **Deposit of Future Response Costs Payments**. The total amount to be paid by SDs pursuant to ¶ 30.a shall be deposited by EPA in the LCP Chemicals Superfund Site Special Account to be retained and used to conduct or finance response actions at or in connection with the Site, or to be transferred by EPA to the EPA Hazardous Substance Superfund, provided, however, that EPA may deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund if, at the time the payment is received, EPA estimates that the LCP Chemicals Superfund Site Special Account balance is sufficient to address currently anticipated future response actions to be conducted or financed by EPA at or in connection with the Site. Any decision by EPA to deposit a Future Response Costs payment directly into the EPA Hazardous Substance Superfund for this reason shall not be subject to challenge by SDs pursuant to the dispute resolution provisions of this CD or in any other forum.

17

31.    **Payment Instructions for SDs: Future Response Costs Payments and Stipulated Penalties.**

a.    For all payments subject to this ¶ 31.a, SDs shall make such payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
> "D 68010727 Environmental Protection Agency"

b.    For all payments made under ¶ 31.a, SDs must include references to the Site/Spill ID and DJ numbers. At the time of any payment required to be made in accordance with ¶ 31.a, SDs shall send notices that payment has been made to the United States, EPA, and the EPA Cincinnati Finance Center, all in accordance with ¶ 83. All notices must include references to the Site/Spill ID and DJ numbers.

32.    **Contesting Future Response Costs.** SDs may submit a Notice of Dispute, initiating the procedures of Section XIII (Dispute Resolution), regarding any Future Response Costs billed under ¶ 30 (Payments by SDs for Future Response Costs) if they determine that EPA has made an accounting error or included a cost item that is not within the definition of Future Response Costs, or if they believe EPA incurred excess costs as a direct result of an EPA action that was inconsistent with a specific provision or provisions of the NCP. Such Notice of Dispute shall be submitted in writing within 30 days after receipt of the bill and must be sent to the United States pursuant to Section XX (Notices and Submissions). Such Notice of Dispute shall specifically identify the contested Future Response Costs and the basis for objection. If SDs submit a Notice of Dispute, SDs shall pay all uncontested Future Response Costs to the United States within 30 days after SDs' receipt of the bill requiring payment. Simultaneously, SDs shall establish, in a duly chartered bank or trust company, an interest-bearing escrow account that is insured by the Federal Deposit Insurance Corporation (FDIC), and remit to that escrow account funds equivalent to the amount of the contested Future Response Costs. SDs shall send to the United States, as provided in Section XX (Notices and Submissions), a copy of the transmittal letter and check paying the uncontested Future Response Costs, and a copy of the correspondence that establishes and funds the escrow account, including, but not limited to, information containing the identity of the bank and bank account under which the escrow account is established as well as a bank statement showing the initial balance of the escrow account. If the United States prevails in the dispute, SDs shall pay the sums due (with accrued interest) to the United States within 10 days after the resolution of the dispute. If SDs prevail concerning any aspect of the contested costs, SDs shall pay that portion of the costs (plus associated accrued interest) for which they did not prevail to the United States within seven days after the resolution of the dispute. SDs shall be disbursed any balance of the escrow account. All payments to the United States under this Paragraph shall be made in accordance with ¶¶ 31.a

18

(instructions for future response cost payments). The dispute resolution procedures set forth in this Paragraph in conjunction with the procedures set forth in Section XIII (Dispute Resolution) shall be the exclusive mechanisms for resolving disputes regarding SDs' obligation to reimburse the United States for its Future Response Costs.

33.     **Interest**. In the event that any payment for Future Response Costs required under this Section is not made by the date required, SDs shall pay Interest on the unpaid balance. The Interest on Future Response Costs shall begin to accrue on the date of the bill. The Interest shall accrue through the date of SDs' payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to Plaintiffs by virtue of SDs' failure to make timely payments under this Section including, but not limited to, payment of stipulated penalties pursuant to ¶ 49 (Stipulated Penalty Amounts – Work). EPA may waive payment of any accrued interest.

## XI.     INDEMNIFICATION AND INSURANCE

34.     **SDs' Indemnification of the United States**.

a.     The United States does not assume any liability by entering into this CD or by virtue of any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e). SDs shall indemnify, save, and hold harmless the United States and its officials, agents, employees, contractors, subcontractors, and representatives for or from any and all claims or causes of action arising from, or on account of, negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on SDs' behalf or under their control, in carrying out activities pursuant to this CD, including, but not limited to, any claims arising from any designation of SDs as EPA's authorized representatives under Section 104(e) of CERCLA. Further, SDs agree to pay the United States all costs it incurs including, but not limited to, attorneys' fees and other expenses of litigation and settlement arising from, or on account of, claims made against the United States based on negligent or other wrongful acts or omissions of SDs, their officers, directors, employees, agents, contractors, subcontractors, and any persons acting on their behalf or under their control, in carrying out activities pursuant to this CD. The United States shall not be held out as a party to any contract entered into by or on behalf of SDs in carrying out activities pursuant to this CD. Neither SDs nor any such contractor shall be considered an agent of the United States.

b.     The United States shall give SDs notice of any claim for which the United States plans to seek indemnification pursuant to this ¶ 34, and shall consult with SDs prior to settling such claim.

35.     SDs covenant not to sue and agree not to assert any claims or causes of action against the United States for damages or reimbursement or for set-off of any payments made or to be made to the United States arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for performance of Work on or relating to Operable Unit One of the Site, including, but not limited to, claims on account of construction delays. In addition, SDs shall indemnify, save and hold harmless the United States with respect to any and all claims for damages or reimbursement arising from or on account of any contract, agreement, or arrangement between any one or more of SDs and any person for

19

performance of Work on or relating to Operable Unit One of the Site, including, but not limited to, claims on account of construction delays.

36.     **Insurance**. No later than 15 days before commencing any on-site Work, SDs shall secure, and shall maintain until the first anniversary after the RA has been performed in accordance with this CD and the Performance Standards have been achieved commercial general liability insurance with limits of $1,000,000.00, for any one occurrence, and automobile liability insurance with limits of $1,000,000.00, combined single limit, naming the United States as an additional insured with respect to all liability arising out of the activities performed by or on behalf of SDs pursuant to this CD. In addition, for the duration of this CD, SDs shall satisfy, or shall ensure that their contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing the Work on behalf of SDs in furtherance of this CD. Prior to commencement of the Work, SDs shall provide to EPA certificates of such insurance and a copy of each insurance policy. SDs shall resubmit such certificates and copies of policies each year on the anniversary of the Effective Date. If SDs demonstrate by evidence satisfactory to EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, SDs need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor. SDs may, on any anniversary of the Effective Date, or at any other time agreed to by the Parties, petition EPA in writing to request a reduction in the applicable insurance amount.

## XII.     FORCE MAJEURE

37.     "Force majeure," for purposes of this CD, is defined as any event arising from causes beyond the control of SDs, of any entity controlled by SDs, or of SDs' contractors that delays or prevents the performance of any obligation under this CD despite SDs' best efforts to fulfill the obligation. The requirement that SDs exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure and best efforts to address the effects of any potential force majeure: (a) as it is occurring; and (b) following the potential force majeure such that the delay and any adverse effects of the delay are minimized to the greatest extent possible. "Force majeure" does not include financial inability to complete the Work or a failure to achieve the Performance Standards.

38.     If any event occurs or has occurred that may delay the performance of any obligation under this CD for which SDs intend or may intend to assert a claim of force majeure, SDs shall notify EPA's Project Coordinator orally or, in his or her absence, EPA's Alternate Project Coordinator or, in the event both of EPA's designated representatives are unavailable, the Director of the Superfund Division, EPA Region 4, within three business days of when SDs first knew that the event might cause a delay. Within 10 days thereafter, SDs shall provide in writing to EPA an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; SDs' rationale for attributing such delay to a force majeure; and a statement describing the anticipated impact of the delay. SDs shall include with any notice all available documentation supporting their claim that the delay was attributable to a force majeure. SDs shall be deemed to know of any circumstance of which SDs, any entity controlled by SDs, or SDs' contractors or

20

subcontractors knew or should have known. Failure to comply with the above requirements regarding an event shall preclude SDs from asserting any claim of force majeure regarding that event, provided, however, that if EPA, despite the late or incomplete notice, is able to assess to its satisfaction whether the event is a force majeure under ¶ 37 and whether SDs have exercised their best efforts under ¶ 37, EPA may, in its unreviewable discretion, excuse in writing SDs' failure to submit timely or complete notices under this Paragraph.

39.     If EPA agrees that the delay or anticipated delay is attributable to a force majeure, the time for performance of the obligations under this CD that are affected by the force majeure will be extended by EPA for such time as is necessary to complete those obligations. An extension of the time for performance of the obligations affected by the force majeure shall not, of itself, extend the time for performance of any other obligation. If EPA does not agree that the delay or anticipated delay has been or will be caused by a force majeure, EPA will notify SDs in writing of its decision. If EPA agrees that the delay is attributable to a force majeure, EPA will notify SDs in writing of the length of the extension, if any, for performance of the obligations affected by the force majeure.

40.     If SDs elect to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution) regarding EPA's decision, they shall do so no later than 15 days after receipt of EPA's notice. In any such proceeding, SDs shall have the burden of demonstrating that the delay or anticipated delay has been or will be caused by a force majeure, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that SDs complied with the requirements of ¶¶ 37 and 38. If SDs carry this burden, the delay at issue shall be deemed not to be a violation by SDs of the affected obligation of this CD identified to EPA and the Court, and the schedules for the affected obligations shall be modified in accordance with the procedures set forth in to ¶ 13 (Modification of SOW or Related Deliverables).

41.     The failure by EPA to timely complete any obligation under the CD or under the SOW is not a violation of the CD, provided, however, that if such failure prevents SDs from meeting one or more deadlines in the SOW, SDs may seek relief under this Section.

## XIII.  DISPUTE RESOLUTION

42.     Unless otherwise expressly provided for in this CD, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes regarding this CD. However, the procedures set forth in this Section shall not apply to actions by the United States to enforce obligations of SDs that have not been disputed in accordance with this Section.

43.     A dispute shall be considered to have arisen when one party sends the other parties a written Notice of Dispute. Any dispute regarding this CD shall in the first instance be the subject of informal negotiations between the parties to the dispute. The period for informal negotiations shall not exceed 30 days from the time the dispute arises, unless it is modified by written agreement of the parties to the dispute.

44.     **Statements of Position.**

a.     In the event that the parties cannot resolve a dispute by informal negotiations under the preceding Paragraph, then the position advanced by EPA shall be

21

considered binding unless, within 30 days after the conclusion of the informal negotiation period, SDs invoke the formal dispute resolution procedures of this Section by serving on the United States a written Statement of Position on the matter in dispute, including, but not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by SDs. The Statement of Position shall specify SDs' position as to whether formal dispute resolution should proceed under ¶ 45 (Record Review) or 46.

b.      Within 20 days after receipt of SDs' Statement of Position, EPA will serve on SDs its Statement of Position, including, but not limited to, any factual data, analysis, or opinion supporting that position and all supporting documentation relied upon by EPA. EPA's Statement of Position shall include a statement as to whether formal dispute resolution should proceed under ¶ 45 (Record Review) or 46. Within 20 days after receipt of EPA's Statement of Position, SDs may submit a Reply.

c.      If there is disagreement between EPA and SDs as to whether dispute resolution should proceed under ¶ 45 (Record Review) or 46, the parties to the dispute shall follow the procedures set forth in the Paragraph determined by EPA to be applicable. However, if SDs ultimately appeal to the Court to resolve the dispute, the Court shall determine which Paragraph is applicable in accordance with the standards of applicability set forth in ¶¶ 45 and 46.

45.     **Record Review**. Formal dispute resolution for disputes pertaining to the selection or adequacy of any response action and all other disputes that are accorded review on the administrative record under applicable principles of administrative law shall be conducted pursuant to the procedures set forth in this Paragraph. For purposes of this Paragraph, the adequacy of any response action includes, without limitation, the adequacy or appropriateness of plans, procedures to implement plans, or any other items requiring approval by EPA under this CD, and the adequacy of the performance of response actions taken pursuant to this CD. Nothing in this CD shall be construed to allow any dispute by SDs regarding the validity of the ROD's provisions.

a.      An administrative record of the dispute shall be maintained by EPA and shall contain all statements of position, including supporting documentation, submitted pursuant to this Section. Where appropriate, EPA may allow submission of supplemental statements of position by the parties to the dispute.

b.      The Director of the Superfund Division, EPA Region 4, will issue a final administrative decision resolving the dispute based on the administrative record described in ¶ 45.a. This decision shall be binding upon SDs, subject only to the right to seek judicial review pursuant to ¶¶ 45.c and 45.d.

c.      Any administrative decision made by EPA pursuant to ¶ 45.b shall be reviewable by this Court, provided that a motion for judicial review of the decision is filed by SDs with the Court and served on all Parties within 15 days after receipt of EPA's decision. The motion shall include a description of the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of this CD. The United States may file a response to SDs' motion.

d.      In proceedings on any dispute governed by this Paragraph, SDs shall have the burden of demonstrating that the decision of the Superfund Division Director is arbitrary and capricious or otherwise not in accordance with law. Judicial review of EPA's decision shall be on the administrative record compiled pursuant to ¶ 45.a.

46.      Formal dispute resolution for disputes that neither pertain to the selection or adequacy of any response action nor are otherwise accorded review on the administrative record under applicable principles of administrative law, shall be governed by this Paragraph.

a.      The Director of the Superfund Division, EPA Region 4, will issue a final decision resolving the dispute based on the statements of position and reply, if any, served under ¶ 44. The Superfund Division Director's decision shall be binding on SDs unless, within 20 days after receipt of the decision, SDs file with the Court and serve on the parties a motion for judicial review of the decision setting forth the matter in dispute, the efforts made by the parties to resolve it, the relief requested, and the schedule, if any, within which the dispute must be resolved to ensure orderly implementation of the CD. The United States may file a response to SDs' motion.

b.      Notwithstanding ¶ M (CERCLA § 113(j) record review of ROD and Work) of Section I (Background), judicial review of any dispute governed by this Paragraph shall be governed by applicable principles of law.

47.      The invocation of formal dispute resolution procedures under this Section does not extend, postpone, or affect in any way any obligation of SDs under this CD, except as provided in ¶ 32 (Contesting Future Response Costs), as agreed by EPA, or as determined by the Court. Stipulated penalties with respect to the disputed matter shall continue to accrue, but payment shall be stayed pending resolution of the dispute, as provided in ¶ 55. Notwithstanding the stay of payment, stipulated penalties shall accrue from the first day of noncompliance with any applicable provision of this CD. In the event that SDs do not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section XIV (Stipulated Penalties), subject to EPA's enforcement discretion to waive Stipulated Penalties pursuant to ¶ 49.

## XIV.   STIPULATED PENALTIES

48.      SDs shall be liable for stipulated penalties in the amounts set forth in ¶¶ 49 and 50 to the United States for failure to comply with the requirements of this CD specified below, unless excused under Section XII (Force Majeure). "Compliance" by SDs shall include completion of all activities and obligations, including payments, required under this CD, or any deliverable approved under this CD, in accordance with all applicable requirements of law, this CD, the SOW, and any deliverables approved under this CD and within the specified time schedules established by and approved under this CD.

49. <u>Stipulated Penalty Amounts - Work (Including Payments and Excluding Deliverables)</u>.

a. The following stipulated penalties shall accrue per violation per day for any noncompliance with obligations identified in ¶ 49.b:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $750.00 |
| 15th through 30th day | $1,500.00 |
| 31st day and beyond | $3,000.00 |

b. <u>Compliance Milestones</u>.

(1) Designating a Project Coordinator and Supervising Contractor according to Paragraph 9;

(2) Complying with emergency release response and reporting requirements according to Paragraph 11;

(3) Conducting community involvement activities, including implementation of a technical assistance plan, according to Paragraph 12;

(4) Paying Future Response Costs according to Paragraph 30;

(5) Placing disputed costs in an escrow account as required by Paragraph 32;

(6) Securing insurance as required by Paragraph 36; and

(7) Establishment and maintenance of financial assurance in compliance with the timelines and other substantive and procedural requirements of Section IX (Financial Assurance).

50. **Stipulated Penalty Amounts - Deliverables**.

a. **Material Defects**. If an initially submitted or resubmitted deliverable contains a material defect, and the deliverable is disapproved or modified by EPA under ¶ 6.6(a) (Initial Submissions) or 6.6(b) (Resubmissions) of the SOW due to such material defect, then the material defect shall constitute a lack of compliance for purposes of ¶ 48. The provisions of Section XIII (Dispute Resolution) and Section XIV (Stipulated Penalties) shall govern the accrual and payment of any stipulated penalties regarding SDs' submissions under this CD.

b. The following stipulated penalties shall accrue per violation per day for failure to submit timely or adequate deliverables pursuant to the CD:

| Period of Noncompliance | Penalty Per Violation Per Day |
|---|---|
| 1st through 14th day | $500.00 |
| 15th through 30th day | $1,000.00 |
| 31st day and beyond | $2,500.00 |

51.     In the event that EPA assumes performance of a portion or all of the Work pursuant to ¶ 62 (Work Takeover), SDs shall be liable for a stipulated penalty in the amount of seven hundred thousand dollars ($700,000.00). Stipulated penalties under this Paragraph are in addition to the remedies available under ¶¶ 27 (Access to Financial Assurance) and 62 (Work Takeover).

52.     Except as otherwise provided in this Paragraph, all penalties shall begin to accrue on the day after the complete performance is due or the day a violation occurs and shall continue to accrue through the final day of the correction of the noncompliance or completion of the activity. However, stipulated penalties shall not accrue: (a) with respect to a deficient submission under ¶ 6.6 (Approval of Deliverables) of the SOW, during the period, if any, beginning on the 31st day after EPA's receipt of such submission until the date that EPA notifies SDs of any deficiency; (b) with respect to a decision by the Director of the Superfund Division, EPA Region 4, under ¶ 45.b or 46.a of Section XIII (Dispute Resolution), during the period, if any, beginning on the 21st day after the date that SDs' reply to EPA's Statement of Position is received until the date that the Director issues a final decision regarding such dispute; or (c) with respect to judicial review by this Court of any dispute under Section XIII (Dispute Resolution), during the period, if any, beginning on the 31st day after the Court's receipt of the final submission regarding the dispute until the date that the Court issues a final decision regarding such dispute. Nothing in this CD shall prevent the simultaneous accrual of separate penalties for separate violations of this CD.

53.     Following EPA's determination that SDs have failed to comply with a requirement of this CD, EPA may give SDs written notification of the same and describe the noncompliance. EPA may send SDs a written demand for payment of the penalties. However, penalties shall accrue as provided in the preceding Paragraph regardless of whether EPA has notified SDs of a violation, subject to EPA's enforcement discretion to waive Stipulated Penalties pursuant to ¶ 49.

54.     All penalties accruing under this Section shall be due and payable to the United States within 30 days after SDs' receipt from EPA of a demand for payment of the penalties, unless SDs invoke the Dispute Resolution procedures under Section XIII (Dispute Resolution) within the 30-day period. All payments to the United States under this Section shall indicate that the payment is for stipulated penalties and shall be made in accordance with ¶ 31.a (instructions for future response cost payments).

55.     Penalties shall continue to accrue as provided in ¶ 52 during any dispute resolution period, but need not be paid until the following:

        a.      If the dispute is resolved by agreement of the parties or by a decision of EPA that is not appealed to this Court, accrued penalties determined to be owed shall be paid to EPA within 15 days after the agreement or the receipt of EPA's decision or order;

        b.      If the dispute is appealed to this Court and the United States prevails in whole or in part, SDs shall pay all accrued penalties determined by the Court to be owed to EPA within 60 days after receipt of the Court's decision or order, except as provided in ¶ 55.c;

        c.      If the District Court's decision is appealed by any Party, SDs shall pay all accrued penalties determined by the District Court to be owed to the United States into an

interest-bearing escrow account, established at a duly chartered bank or trust company that is insured by the FDIC, within 60 days after receipt of the Court's decision or order. Penalties shall be paid into this account as they continue to accrue, at least every 60 days. Within 15 days after receipt of the final appellate court decision, the escrow agent shall pay the balance of the account to EPA or to SDs to the extent that they prevail.

56.     If SDs fail to pay stipulated penalties when due, SDs shall pay Interest on the unpaid stipulated penalties as follows: (a) if SDs have timely invoked dispute resolution such that the obligation to pay stipulated penalties has been stayed pending the outcome of dispute resolution, Interest shall accrue from the date stipulated penalties are due pursuant to ¶ 55 until the date of payment; and (b) if SDs fail to timely invoke dispute resolution, Interest shall accrue from the date of demand under ¶ 54 until the date of payment. If SDs fail to pay stipulated penalties and Interest when due, the United States may institute proceedings to collect the penalties and Interest.

57.     The payment of penalties and Interest, if any, shall not alter in any way SDs' obligation to complete the performance of the Work required under this CD.

58.     Nothing in this CD shall be construed as prohibiting, altering, or in any way limiting the ability of the United States to seek any other remedies or sanctions available by virtue of SDs' violation of this CD or of the statutes and regulations upon which it is based, including, but not limited to, penalties pursuant to Section 122(*l*) of CERCLA, 42 U.S.C. § 9622(*l*), provided, however, that the United States shall not seek civil penalties pursuant to Section 122(*l*) of CERCLA for any violation for which a stipulated penalty is provided in this CD, except in the case of a willful violation of this CD.

59.     Notwithstanding any other provision of this Section, the United States may, in its unreviewable discretion, waive any portion of stipulated penalties that have accrued pursuant to this CD.

## XV.     COVENANTS BY PLAINTIFF

60.     **Covenants for SDs by United States**.

Except as provided in ¶ 61 (General Reservations of Rights), the United States covenants not to sue or to take administrative action against SDs pursuant to Sections 106 and 107(a) of CERCLA for the Work and Future Response Costs. These covenants shall take effect upon the Effective Date. These covenants are conditioned upon the satisfactory performance by SDs of their obligations under this CD. These covenants extend only to SDs and do not extend to any other person.

61.     **General Reservations of Rights**. The United States reserves, and this CD is without prejudice to, all rights against SDs with respect to all matters not expressly included within Plaintiff's covenants. Notwithstanding any other provision of this CD, the United States reserves all rights against SDs with respect to:

a.     liability for failure by SDs to meet a requirement of this CD;

b.     liability arising from the past, present, or future disposal, release, or threat of release of Waste Material outside of the Site;

26

c.      liability based on the ownership of the Site by SDs when such ownership commences after signature of this CD by SDs;

d.      liability based on the operation of the Site by SDs when such operation commences after signature of this CD by SDs and does not arise solely from SDs' performance of the Work;

e.      liability based on SDs' transportation, treatment, storage, or disposal, or arrangement for transportation, treatment, storage, or disposal of Waste Material at or in connection with the Site, other than as provided in the ROD, the Work, or otherwise ordered by EPA, after signature of this CD by SDs;

f.      liability for damages for injury to, destruction of, or loss of natural resources, and for the costs of any natural resource damage assessments;

g.      criminal liability;

h.      liability for violations of federal or state law that occur during or after implementation of the Work; and

i.      liability, prior to achievement of Performance Standards, for additional response actions that EPA determines are necessary to achieve and maintain Performance Standards or to carry out and maintain the effectiveness of the remedy set forth in the ROD, but that cannot be required pursuant to ¶ 13 (Modification of SOW or Related Deliverables);

j.      liability for additional operable units at the Site or the final response action; and

k.      liability for costs that the United States will incur regarding the Site but that are not within the definition of Future Response Costs.

62.     **Work Takeover.**

a.      In the event EPA determines that SDs: (1) have ceased implementation of any portion of the Work; (2) are seriously or repeatedly deficient or late in their performance of the Work; or (3) are implementing the Work in a manner that may cause an endangerment to human health or the environment, EPA may issue a written notice ("Work Takeover Notice") to SDs. Any Work Takeover Notice issued by EPA will specify the grounds upon which such notice was issued and will provide SDs a period of 15 days within which to remedy the circumstances giving rise to EPA's issuance of such notice.

b.      If, after expiration of the 15-day notice period specified in ¶ 62.a, SDs have not remedied to EPA's satisfaction the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice, EPA may at any time thereafter assume the performance of all or any portion(s) of the Work as EPA deems necessary ("Work Takeover"). EPA will notify SDs in writing (which writing may be electronic) if EPA determines that implementation of a Work Takeover is warranted under this ¶ 62.b. Funding of Work Takeover costs is addressed under ¶ 27 (Access to Financial Assurance).

27

c.    SDs may invoke the procedures set forth in ¶ 45 (Record Review), to dispute EPA's implementation of a Work Takeover under ¶ 62.b. However, notwithstanding SDs' invocation of such dispute resolution procedures, and during the pendency of any such dispute, EPA may in its sole discretion commence and continue a Work Takeover under ¶ 62.b until the earlier of: (1) the date that SDs remedy, to EPA's satisfaction, the circumstances giving rise to EPA's issuance of the relevant Work Takeover Notice; or (2) the date that a final decision is rendered in accordance with ¶ 45 (Record Review) requiring EPA to terminate such Work Takeover.

63.    Notwithstanding any other provision of this CD, the United States retains all authority and reserves all rights to take any and all response actions authorized by law.

## XVI.   COVENANTS BY SDs

64.    **Covenants by SDs**. Subject to the reservations in ¶ 66, SDs covenant not to sue and agree not to assert any claims or causes of action against the United States with respect to the Work, past response actions regarding the Site, Future Response Costs, and this CD, including, but not limited to:

a.    any direct or indirect claim for reimbursement from the EPA Hazardous Substance Superfund through CERCLA §§ 106(b)(2), 107, 111, 112 or 113, or any other provision of law;

b.    any claims under CERCLA §§ 107 or 113, RCRA Section 7002(a), 42 U.S.C. § 6972(a), or state law regarding the Work, past response actions regarding the Site, Future Response Costs, and this CD; or

c.    any claims arising out of response actions at or in connection with the Site, including any claim under the United States Constitution, the Georgia Constitution, the Tucker Act, 28 U.S.C. § 1491, the Equal Access to Justice Act, 28 U.S.C. § 2412, or at common law.

65.    Except as provided in ¶¶ 68 (Waiver of Claims by SDs) and 74 (Res Judicata and Other Defenses), the covenants in this Section shall not apply if the United States brings a cause of action or issues an order pursuant to any of the reservations in Section XV (Covenants by Plaintiff), other than in ¶¶ 61.a (claims for failure to meet a requirement of the CD), 61.g (criminal liability), and 61.h (violations of federal/state law during or after implementation of the Work), but only to the extent that SDs' claims arise from the same response action, response costs, or damages that the United States is seeking pursuant to the applicable reservation.

66.    SDs reserve, and this CD is without prejudice to, claims against the United States, subject to the provisions of Chapter 171 of Title 28 of the United States Code, and brought pursuant to any statute other than CERCLA or RCRA and for which the waiver of sovereign immunity is found in a statute other than CERCLA or RCRA, for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the United States, as that term is defined in 28 U.S.C. § 2671, while acting within the scope of his or her office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. However, the foregoing shall not include any claim based on

28

EPA's selection of response actions, or the oversight or approval of SDs' deliverables or activities.

67. Nothing in this CD shall be deemed to constitute approval or preauthorization of a claim within the meaning of Section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

68. **Waiver of Claims by SDs**.

a. **De Micromis Waiver**. SDs agree not to assert any claims and to waive all claims or causes of action (including but not limited to claims or causes of action under Sections 107(a) and 113 of CERCLA) that they may have for all response costs relating to the Site against any person where the person's liability to SDs with respect to the Site is based solely on having arranged for disposal or treatment, or for transport for disposal or treatment, of hazardous substances at the Site, or having accepted for transport for disposal or treatment of hazardous substances at the Site, if all or part of the disposal, treatment, or transport occurred before April 1, 2001, and the total amount of material containing hazardous substances contributed by such person to the Site was less than 110 gallons of liquid materials or 200 pounds of solid materials;

b. **Exceptions to Waiver**.

(1) The waiver under ¶ 68.a (De Micromis Waiver) shall not apply with respect to any defense, claim, or cause of action that a SD may have against any person otherwise covered by such waiver if such person asserts a claim or cause of action relating to the Site against such SD.

(2) The waiver under ¶ 68.a (De Micromis Waiver) shall not apply to any claim or cause of action against any person otherwise covered by such waiver if EPA determines that: (i) the materials containing hazardous substances contributed to the Site by such person contributed significantly or could contribute significantly, either individually or in the aggregate, to the cost of the response action or natural resource restoration at the Site; or (ii) such person has failed to comply with any information request or administrative subpoena issued pursuant to Section 104(e) or 122(e)(3)(B) of CERCLA, 42 U.S.C. § 9604(e) or 9622(e)(3)(B), or Section 3007 of RCRA, 42 U.S.C. § 6927, or has impeded or is impeding, through action or inaction, the performance of a response action or natural resource restoration with respect to the Site; or if (iii) such person has been convicted of a criminal violation for the conduct to which the waiver would apply and that conviction has not been vitiated on appeal or otherwise.

## XVII. EFFECT OF SETTLEMENT; CONTRIBUTION

69. Except as provided in ¶ 68 (Waiver of Claims by SDs), nothing in this CD shall be construed to create any rights in, or grant any cause of action to, any person not a Party to this CD. Except as provided in Section XVI (Covenants by SDs), each of the Parties expressly reserves any and all rights (including, but not limited to, pursuant to Section 113 of CERCLA, 42 U.S.C. § 9613), defenses, claims, demands, and causes of action that each Party may have with respect to any matter, transaction, or occurrence relating in any way to the Site against any person not a Party hereto. Nothing in this CD diminishes the right of the United States, pursuant to Section 113(f)(2) and (3) of CERCLA, 42 U.S.C. § 9613(f)(2)-(3), to pursue any such persons

29

to obtain additional response costs or response action and to enter into settlements that give rise to contribution protection pursuant to Section 113(f)(2).

70.     The Parties agree, and by entering this CD this Court finds, that this CD constitutes a judicially-approved settlement pursuant to which each SD has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), and is entitled, as of the Effective Date, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, or as may be otherwise provided by law, for the "matters addressed" in this CD. The "matters addressed" in this CD are the Work and Future Response Costs.

71.     The Parties further agree, and by entering this CD this Court finds, that the complaint filed by the United States in this action is a civil action within the meaning of Section 113(f)(1) of CERCLA, 42 U.S.C. § 9613(f)(1), and that this CD constitutes a judicially-approved settlement pursuant to which each Settling Defendant has, as of the Effective Date, resolved liability to the United States within the meaning of Section 113(f)(3)(B) of CERCLA, 42 U.S.C. § 9613(f)(3)(B).

72.     Each SD shall, with respect to any suit or claim brought by it for matters related to this CD, notify the United States in writing no later than 60 days prior to the initiation of such suit or claim.

73.     Each SD shall, with respect to any suit or claim brought against it for matters related to this CD, notify in writing the United States within 10 days after service of the complaint on such SD. In addition, each SD shall notify the United States within 10 days after service or receipt of any Motion for Summary Judgment and within 10 days after receipt of any order from a court setting a case for trial.

74.     **Res Judicata and Other Defenses**. In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, recovery of response costs, or other appropriate relief relating to the Site, SDs shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case; provided, however, that nothing in this Paragraph affects the enforceability of the covenants not to sue set forth in Section XV (Covenants by Plaintiff).

## XVIII. ACCESS TO INFORMATION

75.     SDs shall provide to EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within SDs' possession or control or that of their contractors or agents relating to activities at the Site or to the implementation of this CD, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. SDs shall also make available to EPA, for purposes of investigation, information gathering, or testimony, their employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

76.   **Privileged and Protected Claims**.

a.      SDs may assert that all or part of a Record requested by Plaintiff is privileged or protected as provided under applicable law, in lieu of providing the Record, provided SDs comply with ¶ 76.b, and except as provided in ¶ 76.c.

b.      If SDs assert a claim of privilege or protection, they shall provide Plaintiff with the following information regarding such Record, to the extent known by the SD: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, SDs shall provide the Record to Plaintiff in redacted form to mask the privileged or protected portion only. SDs shall retain all Records that they claim to be privileged or protected until Plaintiff has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the SDs' favor.

c.      SDs may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological or engineering data, or the portion of any other Record that evinces conditions at or around the Site; or (2) the portion of any Record that SDs are required to create or generate pursuant to this CD.

77.   **Business Confidential Claims**. SDs may assert that all or part of a Record provided to Plaintiff under this Section or Section XIX (Retention of Records) is business confidential to the extent permitted by and in accordance with Section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). SDs shall segregate and clearly identify all Records or parts thereof submitted under this CD for which SDs assert business confidentiality claims. Records submitted to EPA determined to be confidential by EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentiality accompanies Records when they are submitted to EPA, or if EPA has notified SDs that the Records are not confidential under the standards of Section 104(e)(7) of CERCLA or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to SDs.

78.   If relevant to the proceeding, the Parties agree that validated sampling or monitoring data generated in accordance with the SOW and reviewed and approved by EPA shall be admissible as evidence, without objection, in any proceeding under this CD.

79.   Notwithstanding any provision of this CD, Plaintiff retains all of its information gathering and inspection authorities and rights, including enforcement actions related thereto, under CERCLA, RCRA, and any other applicable statutes or regulations.

## XIX.   RETENTION OF RECORDS

80.   Until five years after EPA's Certification of Work Completion under ¶ 4.7 (Certification of Work Completion) of the SOW, each SD shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that SDs who are potentially liable as owners or operators of the Site must retain, in addition, all Records that relate to the liability of

any other person under CERCLA with respect to the Site. Each SD must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that each SD (and its contractors and agents) must retain, in addition, copies of all data generated during the performance of the Work and not contained in the aforementioned Records required to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

81.     At the conclusion of this record retention period, SDs shall notify the United States at least 90 days prior to the destruction of any such Records, and, upon request by the United States, and except as provided in ¶ 76 (Privileged and Protected Claims), SDs shall deliver any such Records to EPA.

82.     Each SD certifies individually that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA and State requests for information regarding the Site pursuant to Sections 104(e) and 122(e)(3)(B) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e)(3)(B), and Section 3007 of RCRA, 42 U.S.C. § 6927, and state law.

## XX.    NOTICES AND SUBMISSIONS

83.     All approvals, consents, deliverables, modifications, notices, notifications, objections, proposals, reports, and requests specified in this CD must be in writing unless otherwise specified. Whenever, under this CD, notice is required to be given, or a report or other document is required to be sent, by one Party to another, it must be directed to the person(s) specified below at the address(es) specified below. Any Party may change the person and/or address applicable to it by providing notice of such change to all Parties. All notices under this Section are effective upon receipt, unless otherwise specified. Notices required to be sent to EPA, and not to the United States, should not be sent to the DOJ. Except as otherwise provided, notice to a Party by email (if that option is provided below) or by regular mail in accordance with this Section satisfies any notice requirement of the CD regarding such Party.

**As to the United States:**          EES Case Management Unit
                                      U.S. Department of Justice
                                      Environment and Natural Resources Division
                                      P.O. Box 7611
                                      Washington, DC  20044-7611
                                      eescdcopy.enrd@usdoj.gov
                                      Re: DJ # 90-11-2-1237/3

| | |
|---|---|
| **As to EPA:** | Director, Superfund Division<br>U.S. Environmental Protection Agency<br>Region 4<br>61 Forsyth Street, SW<br>Atlanta, GA  30303 |
| **and:** | Galo Jackson<br>EPA Project Coordinator<br>U.S. Environmental Protection Agency<br>Region 4<br>61 Forsyth Street, SW<br>Atlanta, GA  30303<br>jackson.galo@epa.gov<br>(404) 562-8937 |
| **As to EPA Cincinnati Finance Center:** | EPA Cincinnati Finance Center<br>26 W. Martin Luther King Drive<br>Cincinnati, OH  45268<br>cinwd_acctsreceivable@epa.gov |
| **As to Georgia Power Company:** | Douglas A. Henderson<br>Troutman Sanders LLP<br>Bank of America Plaza, Suite 5200<br>600 Peachtree Street, NE<br>Atlanta, GA  30308-2216<br>douglas.henderson@troutmansanders.com<br>(404) 885-3479 |
| **As to Honeywell International Inc.:** | Tom Byrne<br>Chief Environmental Counsel<br>Honeywell International Inc.<br>115 Tabor Road<br>Morris Plains, NJ  07950<br>tom.byrne@honeywell.com<br>(973) 455-2775 |
| **and:** | Adam G. Sowatzka<br>King & Spalding, LLP<br>1180 Peachtree Street, NE<br>Atlanta, GA  30309<br>asowatzka@kslaw.com<br>(404) 572-3508 |

## XXI.   RETENTION OF JURISDICTION

84.     This Court retains jurisdiction over both the subject matter of this CD and the Parties for the duration of the performance of the terms and provisions of this CD for the purpose

33

of enabling any of the Parties to apply to the Court at any time for such further order, direction, and relief as may be necessary or appropriate for the construction or modification of this CD, or to effectuate or enforce compliance with its terms, or to resolve disputes in accordance with Section XIII (Dispute Resolution).

## XXII.  APPENDICES

85.     The following appendices are attached to and incorporated into this CD:

"Appendix A" is the ROD.

"Appendix B" is the SOW.

"Appendix C" is a map of the Affected Property and the Site.

## XXIII. MODIFICATION

86.     Except as provided in ¶ 13 (Modification of SOW or Related Deliverables), material modifications to this CD, including the SOW, shall be in writing, signed by the United States and SDs, and shall be effective upon approval by the Court. Except as provided in ¶ 13, non-material modifications to this CD, including the SOW, shall be in writing and shall be effective when signed by duly authorized representatives of the United States and SDs. A modification to the SOW shall be considered material if it implements a ROD amendment that fundamentally alters the basic features of the selected remedy within the meaning of 40 C.F.R. § 300.435(c)(2)(ii). Before providing its approval to any modification to the SOW, the United States will provide the State with a reasonable opportunity to review and comment on the proposed modification. Schedules specified in this CD or the SOW for completion of the Work may be modified by agreement of the EPA Project Coordinator and the SDs.  All such modifications shall be made in writing.

87.     Nothing in this CD shall be deemed to alter the Court's power to enforce, supervise, or approve modifications to this CD.

## XXIV. LODGING AND OPPORTUNITY FOR PUBLIC COMMENT

88.     This CD shall be lodged with the Court for at least 30 days for public notice and comment in accordance with Section 122(d)(2) of CERCLA, 42 U.S.C. § 9622(d)(2), and 28 C.F.R. § 50.7. The United States reserves the right to withdraw or withhold its consent if the comments regarding the CD disclose facts or considerations that indicate that the CD is inappropriate, improper, or inadequate. SDs consent to the entry of this CD without further notice.

89.     If for any reason the Court should decline to approve this CD in the form presented, this agreement is voidable at the sole discretion of any Party and the terms of the agreement may not be used as evidence in any litigation between the Parties.

## XXV.  SIGNATORIES/SERVICE

90.     Each undersigned representative of a SD to this CD and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice

34

certifies that he or she is fully authorized to enter into the terms and conditions of this CD and to execute and legally bind such Party to this document.

91.     Each SD agrees not to oppose entry of this CD by this Court or to challenge any provision of this CD unless the United States has notified SDs in writing that it no longer supports entry of the CD.

92.     Each SD shall identify, on the attached signature page, the name, address, and telephone number of an agent who is authorized to accept service of process by mail on behalf of that Party with respect to all matters arising under or relating to this CD. SDs agree to accept service in that manner and to waive the formal service requirements set forth in Rule 4 of the Federal Rules of Civil Procedure and any applicable local rules of this Court, including, but not limited to, service of a summons. SDs need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this CD.

## XXVI. FINAL JUDGMENT

93.     This CD and its appendices constitute the final, complete, and exclusive agreement and understanding among the Parties regarding the settlement embodied in the CD. The Parties acknowledge that there are no representations, agreements, or understandings relating to the settlement other than those expressly contained in this CD.

94.     Upon entry of this CD by the Court, this CD shall constitute a final judgment between and among the United States and SDs. The Court enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

SO ORDERED THIS ___27th___ DAY OF _____July_____, 2016.

_____
United States District Judge

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

7/28/16
Dated

John C. Cruden
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division
Washington, DC  20530

Leslie Coleman
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, DC  20044-7611

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR THE UNITED STATES OF AMERICA:**

EDWARD J. TARVER
UNITED STATES ATTORNEY

7/29/16
Dated

Bradford C. Patrick
Assistant United States Attorney
South Carolina Bar No. 102092
U.S. Attorney's Office
Post Office Box 8970
Savannah, GA  31412

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY:**

Franklin E. Hill
Director
Superfund Division
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, SW
Atlanta, GA  30303

Stacey A. Haire
Senior Attorney
Office of Regional Counsel
U.S. Environmental Protection Agency, Region 4
61 Forsyth Street, SW
Atlanta, GA  30303

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR HONEYWELL INTERNATIONAL INC.:**

5/17/2016
Dated

Name (print): D, Evan van Hook
Title: VP HSESP
Address: 115 Tabor Road
Morris Plains, NJ 07950

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name:       Adam G. Sowatzka
Company:    King & Spalding, LLP
Address:    1180 Peachtree Street, NE
            Atlanta, GA 30309
Phone:      (404) 572-3508
Email:      asowatzka@kslaw.com

Signature Page for CD regarding the LCP Chemicals Superfund Site

**FOR GEORGIA POWER COMPANY:**

May 19, 2016
Dated

Name (print): Christopher Cummiskey
Title: Executive Vice-President
Address:

Agent Authorized to Accept Service
on Behalf of Above-signed Party:

Name (print): Keith T. Hill
Title: Managing Attorney
Company: Georgia Power Co.
Address: 241 Ralph McGill Blvd. NE
BIN 26026 ATLANTA, GA 30308
Phone: 404-506-7807
Email: KTHill@Southernco.com